# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4117 | **DATE** | 3/26/2003 |
| **CASE TITLE** | Robert Green, et al vs. Peoples Energy Corp., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the Court grants defendants' Motions to Dismiss [8-1, 70-1]. This case is hereby terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 28 2003 | | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT GREEN, SHERIDAN EAST, INC., LEWIS CLARK, and CATHY GAFFNEY, each individually and on behalf of all persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PEOPLES ENERGY CORPORATION d/b/a THE PEOPLES GAS LIGHT AND COKE COMPANY, NORTH SHORE GAS COMPANY and NICOR a/k/a NORTHERN ILLINOIS GAS COMPANY, <br><br> Defendants. | Judge Ronald A. Guzmán <br><br> 02 C 4117 |



## MEMORANDUM OPINION AND ORDER

Robert Green, Lewis Clarke, Cathy Gaffney and Sheridan East, Inc. ("Plaintiffs") have filed a class action complaint ("Complaint") against The Peoples Gas Light and Coke Company ("Peoples Gas"), North Shore Gas Company ("North Shore") and Nicor (a/k/a Northern Illinois Gas Company) for violation of sections 1 and 2 of the Sherman Act (Count I) by providing natural gas meters to their customers and charging them a monthly rental fee. Plaintiffs also allege that defendants' practice constitutes violation of sections 3, 4 and 11 of the Clayton Act (Count II), which prohibit illegal tying arrangements. People's Energy Corporation is the holding company of both Peoples Gas and North Shore (collectively "Peoples Energy"). Before the Court are Peoples Energy and Nicor's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure

("Rule") 12(b)(6). For the reasons provided in this Memorandum Opinion and Order, the Court grants the motions.

## FACTS

Peoples Gas, North Shore and Nicor are the major providers of natural gas to residential customers in the metropolitan regions of Chicago, Illinois and Northeastern Illinois, including distribution in the counties of Cook, Will, Dupage, Kane, Lake and other counties. (Compl. ¶ 7.) Peoples Gas, North Shore and Nicor control facilities such as natural gas storage facilities and pipelines essential to the transmission and distribution of natural gas to the end users. (*Id.* ¶ 9.) Green, Sheridan East, Inc., Clarke and Gaffney are customers of the above providers purchasing natural gas for end use. (*Id.* ¶ 10.) It is necessary for all end users and customers to have a gas meter to measure the amount of gas delivered for consumption. (*Id.* ¶ 11.) For at least the last four years preceding the filing of the Complaint, defendants Peoples Gas, North Shore and Nicor have purchased large quantities of residential gas meters and installed them at the home of their customers, charging the customers a monthly rental fee for the meters but not disclosing it as a rental fee by including it in a customer charge. (*Id.* ¶¶ 15, 17.) Defendants may have submitted the customer fee as part of their submission of a rate plan to a regulatory agency or commission. (*Id.* ¶ 18.) Similar residential gas meters are available for sale in northern Illinois, northwest Indiana, southeast Illinois as well as over the internet. (*Id.* ¶ 16.) All three providers refuse to allow their customers to purchase or rent their own meters from some other source. (*Id.* ¶¶ 19, 21.) Green, Sheridan East, Inc., Clarke and Gaffney all could have purchased their own meters at a price lower than the accumulated

2

charges for the rental of the meters over the past four years preceding the filing of the Complaint. (*Id.* ¶ 24.)

## DISCUSSION

In ruling on a motion to dismiss, the court must accept all allegations as true and draw all reasonable inferences in favor of the non-moving party. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or merits of the case. *Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 805 (N.D. Ill. 1996). This provision must be read in conjunction with Rule 8(a) which mandates a short and plain statement of the claim showing that the pleader is entitled to relief. *Id.* The Federal Rules of Civil Procedure only require notice pleading, and the pleadings "must be liberally construed and mere vagueness or lack of detail alone cannot be sufficient grounds for dismissal." *Id.* As a result, a motion to dismiss may be granted only if the court concludes that the non-movant can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

### A. The Filed Rate Doctrine

Defendants argue that plaintiffs' claims are barred by the filed rate doctrine. Defendants contend that plaintiffs are attacking the Customer Charge approved by the Illinois Commerce Commission (the "ICC") as a part of their rates.

Plaintiffs counter that the filed rate doctrine is inapplicable to the case at bar.

3

Plaintiffs put forward five arguments. First, they argue that they are not attacking any regulated rates, but tying of products, *i.e.*, the tying of meters to the provision of natural gas. Second, they assert that the filed rate doctrine has never been held to bar equitable relief. Third, they argue that the Supreme Court in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986), expressly stated that the filed rate doctrine does not create an exemption to the antitrust laws. Fourth, plaintiffs question the continued viability of the doctrine. Fifth, plaintiffs cite *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), for the proposition that more than simply a "filed rate" is needed for the doctrine to apply.

The filed rate doctrine forbids a court to revise a regulated utility or common carrier's filed tariff, *i.e.*, one that has been approved by the regulating agency. *Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001) (stating filed rate doctrine barred antitrust claim by state prison inmates against telephone companies). A customer or competitor can challenge the filed tariff before the agency itself. *Id.* If dissatisfied, the challenger may seek judicial review, but he or she cannot petition a court to revise the tariff. *Id.* The doctrine was first enunciated by the Supreme Court in *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 163-65 (1922). In *Keogh*, the Supreme Court dismissed antitrust claims arising as a result of an alleged conspiracy among railroads to fix high rates, which had been approved by the Interstate Commerce Commission. *Id.* The doctrine has since been frequently applied. *See, e.g., Square D*, 476 U.S. at 424 (affirming dismissal of antitrust class action for treble damages in which a conspiracy to keep rates unreasonably high was alleged); *In re Wheat Rail Freight Rate Antitrust Litig.*, 759 F.2d 1305, 1311-13 (7th Cir. 1985) (affirming dismissal of antitrust claim under FED.

4

R. CIV. P. 12(b)(6)); *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994) (stating that a filed rate is "per se reasonable and unassailable in judicial proceedings brought by ratepayers").

The filed rate doctrine is based both on "historical antipathy to rate setting by courts" and on "a policy of forbidding price discrimination by public utilities and common carriers." *Arsberry*, 244 F.3d at 562. Indeed, one rationale for this doctrine is to protect the "exclusive authority" of a regulating agency to set such tariffs. *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000) (citing *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 577-78 (1981)). Though many earlier cases discuss the doctrine in the context of federal tariffs, the filed rate doctrine has consistently been invoked in the Seventh Circuit and at least two other Circuits to dismiss claims based on rates filed with a state regulatory agency. *See, e.g., Goldwasser v. Ameritech Corp.*, No. 97 C 6788, 1998 WL 60878, at *7 (N.D. Ill. Feb. 4, 1998), *aff'd*, 222 F.3d 390, 402 (7th Cir. 2000) (affirming district court's application of doctrine to dismiss federal class action antitrust suit challenging telephone rates approved by state public utility commissions); *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 494 (8th Cir. 1992) ("the rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency"); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (holding that the filed rate doctrine "applies with equal force" whether the rate at issue is set by a state or federal agency).

This Court concludes that the filed rate doctrine applies to the facts here. Despite plaintiffs' allegation to the contrary, they are in fact challenging the Customer Charge filed as part of the tariffs.

Peoples Gas, North Shore and Nicor are public utilities that are subject to the provisions of the Illinois Public Utilities Act (the "PUA"), 220 ILL. COMP. STAT. 5/1-101, *et seq.* Section 9-201 of the PUA requires the filing of rates with the ICC and authorizes the ICC "to enter upon a hearing concerning the propriety of such [filed] rate or other charge . . . ." *Id.* 5/9-201. All three defendants have respectively filed their Schedule of Rates with the ICC. A Customer Charge is expressly included as part of the rates charged by all defendants. Nicor's filed tariff provides that "[c]harges shall be the sum" of (a) Monthly Customer Charge, (b) Distribution Charge, and (c) Gas Supply Cost. (Mem. Supp. Def. Nicor's Mot. Dismiss, Ex. C.) In the case of both Peoples Gas and North Shore, the filed tariffs provide that "[t]he rates for services hereunder shall consist of a Gas Charge, a Customer Charge and a Distribution Charge." (Def. Peoples Energy's Mem. Supp. Def.'s Mot. Dismiss, Ex. E & F.) In both Peoples Gas and North Shore's tariffs, the Customer Charge is defined as "[a] fixed monthly charge that recovers the costs associated with making service available to customers." (*Id.*)

In sum, the Customer Charge is not a "meter rental charge" as plaintiffs assert, but part and parcel of the rates filed with the ICC. Because plaintiffs are in fact challenging the defendant utilities' filed rates under the guise of federal antitrust allegations, the filed rate doctrine squarely bars their claims. Indeed, plaintiffs themselves acknowledge as much when they allege defendants might have submitted the Customer Charge to the ICC. (Compl. ¶ 19.) This Court will not venture into the unchartered territory of rate-setting at the urging of plaintiffs; it is long settled that rate-setting is a job better left to the regulating agency, which is the ICC in the instant case. The fact that defendants filed the rate with a state agency, the ICC, and not a federal

agency, does not render the doctrine any less applicable.

Plaintiffs still have several arrows in their quiver. First, they claim that the filed rate doctrine cannot bar equitable relief. They rely on *Square D*, 476 U.S. 409, for the proposition that "*Keogh* simply held that an award of treble damages is not an available remedy." 476 U.S. 409, 422 (1986). Plaintiffs therefore reason that the filed rate doctrine cannot bar equitable relief. Their reliance is misplaced because they ignore the particular circumstances under which equitable relief is held to survive the filed rate doctrine. The state action doctrine has been held not to bar equitable relief only in cases where such relief would not result in altering the filed tariffs. In a case involving an antitrust claim that an electric wholesaler had engineered a price squeeze, the First Circuit acknowledged that at least two Supreme Court cases "carved out a potential exception for antitrust injunctive relief." *Town of Norwood*, 202 F.3d at 419 (citing *Square D*, 476 U.S. 409, and *Georgia v. Pennsylvania Ry. Co.*, 324 U.S. 439 (1945)). However, the *Norwood* court distinguished the two Supreme Court cases on the ground that both involved possible price-fixing conspiracies that could have been enjoined without "tampering with" the filed tariffs. *Id.* at 419-20. Reasoning that any injunctive relief as to the price squeeze at issue would alter the filed tariffs, the *Norwood* court concluded that the filed rate doctrine barred equitable relief as well. *Id.* at 420. In accord with *Norwood*, the Seventh Circuit in *Arsberry v. Illinois*, 244 F.3d 558, 566 (7th Cir. 2001), affirmed the dismissal of the "vertical dimension" of the plaintiffs' antitrust claim (including injunctive relief) based on the filed rate doctrine. Central to the *Arsberry* analysis was the "bare hint of horizontal agreement" present in the *Georgia* line of cases. *Id.* The First Circuit's reasoning is equally applicable here. As in *Norwood*, in the

7

instant case there is no allegation of horizontal price-fixing conspiracy by the plaintiffs, and injunctive relief would definitely entail an alteration of the defendants' filed rates with the ICC. Therefore, plaintiffs' contention that the filed rate doctrine cannot bar equitable relief cannot stand.

Next plaintiffs argue that *Keogh* did not create an exemption to the antitrust laws. In cases where injunctive relief as well as damages is prayed, the critical inquiry is whether granting the injunctive relief will require dismantling the filed tariffs. If horizontal agreement is alleged and therefore the injunctive relief can be enforced without tampering with the field rates, then the *Georgia* line of cases dictates the filed rate doctrine should not be an absolute bar. However, if the injunctive relief sought cannot be granted without altering the filed rates, as is in the instant case, then there is an exemption to the antitrust laws. Indeed, the filed rate doctrine has been invoked to immunize a utility from federal antitrust liability. *See, e.g., Goldwasser*, 222 F.3d at 402 (stating doctrine immunized telephone company from antitrust liability for rates filed with state utility commissions); *In re Wheat Rail Freight Antitrust Litig.*, 759 F.2d at 1316 (stating doctrine immunized railroad carriers from antitrust liability for rates filed with the Interstate Commerce Commission).

Finally, plaintiffs question the continued validity of the filed rate doctrine. Specifically, they point to a limited repeal of the doctrine that occurred as part of Congress's deregulation of the interstate motor carrier industry. 49 U.S.C. § 13710(a)(4). Congress repealed statutory provisions requiring a carrier to file tariffs for all types of goods it transports. *See Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000). However, this limited repeal in no way impairs the continuing validity

of the doctrine in other contexts where tariffs continue to be filed. *See Goldwasser*, 222 F.3d at 402 (affirming district court's application of doctrine in telephone rate case).

In conclusion, the Court holds that the filed rate doctrine bars plaintiffs' claims under both the Sherman Act and the Clayton Act. The Court grants defendants' motions to dismiss on this ground.

**B. The State Action Doctrine**

Defendants alternatively argue that the state action doctrine independently bars plaintiffs' federal antitrust claims. Plaintiffs counter that the state action doctrine does not apply.

The state action doctrine originated in the Supreme Court case *Parker v. Brown*, 317 U.S. 341, 351 (1943), and immunizes state regulatory restraints from federal antitrust challenges. This doctrine is predicated on principles of federalism and respect for the sovereignty of states. *Id.*; *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 103 (1980) ("[The] immunity for state regulatory programs is grounded in our federal structure."). In *Midcal*, the Supreme Court articulated a two-prong test for establishing antitrust immunity under *Parker*. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy;" second, the policy must be "actively supervised" by the state itself. *Midcal*, 445 U.S. at 105 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410 (1978)). In *Midcal*, a wine distributor instituted a Sherman Act antitrust challenge to California's resale price maintenance and price posting statutes for the wholesale wine trade. Applying its two-prong test, the Court in *Midcal* held that the California wine-pricing system meets the

9

first prong because California's legislative policy is "forthrightly stated and clear in its purpose" to permit resale price maintenance. *Id.* The *Midcal* Court nevertheless decided not to apply the state action doctrine after concluding that the system does not meet the second requirement. Characterizing the pricing system as "essentially a private price-fixing arrangement," the Court in *Midcal* concluded the State of California "neither established prices nor reviewed reasonableness of price schedules." *Id.*

Applying these principles, this Court holds that defendants' rates and provision of meters satisfy both prongs of the *Midcal* test and therefore comes within the state action doctrine. First, the Customer Charge and provision of meters by defendants are "clearly articulated and affirmatively expressed as state policy." *Midcal*, 445 U.S. at 105. Defendants are public utilities subject to the provisions of the PUA. 220 ILL. COMP. STAT. 5/1-101, *et seq.* Section 1-102 of the PUA expressly declares that "[i]t is the policy of the State that public utilities shall continue to be regulated effectively and comprehensively." *Id.* 5/1-102. The Illinois Antitrust Act (the "IAA") further demonstrates the State's intent to displace competition with a regulatory structure governing gas utilities. Section 5 of the IAA contains language incorporating the *Midcal* test and expressly exempts from antitrust challenges any activity of a public utility "to the extent that such activities are subject to a clearly articulated and affirmatively expressed State policy to replace competition with regulation, where the conduct to be exempted is actively supervised by the state itself." 740 ILL. COMP. STAT. 10/5(3); *see Local 777, DUOC v. Illinois Commerce Comm'n*, 45 Ill. 2d 527, 535 (Ill. 1970) ("[the exemption] reaffirmed the policy expressed in the Public Utilities Act that strict supervision and regulation, particularly with respect to rates charged and services

10

provided, make an effective safeguard against the evils of monopoly . . . .") Clearly, the State of Illinois has articulated in its statutes a clear policy of displacing competition with regulation of public utilities.

The fact that the two Illinois statutes do not specifically address the provision of meters by defendants is of no significance. In *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 57 (1985), the Supreme Court gave a broad interpretation to this prong and held that "[a]s long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied." The Court further held that a state policy that permits but does not compel anticompetitive conduct by a regulated private party is sufficient to satisfy this element, and the Court emphasized that a defendant seeking immunity "need not point to a specific, detailed legislative authorization for its challenged conduct. *Id.* at 61 (internal quotations omitted). The Court found the defendant rate bureaus immune from antitrust liability for their collective ratemaking activities in Mississippi even though the Mississippi legislature did not specifically address collective ratemaking. *Id.* It was sufficient that the state legislature had authorized its public service commission to prescribe "just and reasonable rates" and that the commission had approved collective ratemaking based on this authority. *Id.* As in *Southern Motor Carriers*, in the instant case defendants need not point to any specific legislative authorization for the ownership of the residential meters at issue here.

Second, the State of Illinois actively supervises the defendants' activities by way of setting up a comprehensive regulatory scheme under the PUA. The PUA created the ICC and granted it the power of "general supervision of all public utilities." 220 ILL.

11

COMP. STAT. 5/4-101. Specifically, Section 9-201 of the PUA requires the filing of rates with the ICC and authorizes the ICC "to enter upon a hearing concerning the propriety of [filed] rate or other charge . . . ." 220 ILL. COMP. STAT. 5/9-201. Further, Section 8-301 of the PUA authorizes the ICC "to establish reasonable rules, regulations, specifications and standards to secure the accuracy of all meters and appliances for examining, measuring or testing such service, product or commodity." 220 ILL. COMP. STAT. 5/8-301.

Pursuant to its authority under the PUA, and after holding lengthy hearings which could span several months, the ICC entered orders approving a Schedule of Rates ("Tariff") for all three defendants. The Tariffs establish both the rates to be charged and the terms and conditions of service to be provided. Specifically, the Terms and Conditions of Service section of the Schedule of Rates filed by Nicor provide that "[Nicor] will *furnish*, install, and maintain all metering equipment necessary for measuring and billing the gas supplied." (Mem. Supp. Def. Nicor's Mot. Dismiss, Ex. C (emphasis added).) Likewise, the Terms and Conditions of Service section of the Schedule of Rates filed by Peoples Gas and North Shore provides that the gas delivered to a customer "shall be measured by a meter or meter . . . *to be installed by the Company.*" (Def. Peoples Energy's Mem. Supp. Def.'s Mot. Dismiss, Ex. E & F (emphasis added).) The same section further provides that "[u]nless otherwise provided by contract between the Company and the customer, all meters and other appliances and equipment *furnished by and at the expense of the Company* . . . shall be and remain the property of the Company." (*Id.* (emphasis added).) After holding hearings, the ICC approved the terms and conditions as part of the filed tariffs after hearings, and therefore

12

it endorsed the utilities' ownership of gas meters installed at the customers' premises.

In addition, pursuant to Section 8-301 of the PUA the ICC promulgated regulations specifically designed to ensure gas meter accuracy and safety. 83 ILL. ADMIN. CODE 500.170-500.250 (requiring a gas utility, *inter alia*, to test and maintain meters). Together, the PUA, regulations, and tariffs impose a myriad of duties on defendants to install, maintain, test and replace natural gas meters installed on customers' premises. The PUA provides the general framework for regulation of the rates and activities of utilities, authorizing ICC to set rates and regulate defendants' activities. In the instant case, the ICC approved the Customer Charge as a part of defendants' rates and approved the Terms of Conditions of Service contained in the Tariffs. More importantly, the ICC conducted elaborate hearings before it issued its approval. Therefore, the State of Illinois, through the ICC, has played an active role in supervising defendants' tariff-setting activities.

Plaintiffs argue that the extent of supervision exercised by the State of Illinois is not sufficient to satisfy the second prong of the *Midcal* Test. Specifically, they heavily rely on *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 638 (1992), for the proposition that the state should undertake "the necessary steps to determine the specifics of the price-fixing or ratesetting scheme." *Id*.

Plaintiffs' reliance on *Ticor* is misplaced because *Ticor* is clearly distinguishable from the case at bar. In *Ticor*, the Supreme Court held that the state action doctrine did not bar the FTC's action against the defendant title insurance companies for violation of the Federal Trade Commission Act, on the ground that there was no active supervision in Wisconsin and Montana. *Id*. at 638-40. However, pivotal to the Supreme Court's

decision is the existence of the negative option rule in Wisconsin and Montana. *Id.* at 638. According to the negative option rule, the rates filed with state agencies became effective unless rejected within a specified time. *Id.* Specifically, the Administrative Law Judge found that "at most the rate filings were checked for mathematical accuracy," while some went totally unchecked. *Id.* It was under these particular circumstances that the Supreme Court decided that there was no active supervision. *Id.* Of particular relevance to the case at bar is the *Ticor* Court's discussion of *Southern Motor Carriers*. According to the *Ticor* Court, the Supreme Court in *Southern Motor Carriers* undertook no real examination of the second prong of the *Midcal* test, as the government already conceded it. *Id.* at 639. The *Ticor* Court further pointed out that this concession was made against the background that "the State had ordered and held *ratemaking hearings on a consistent basis*," despite the fact that the submitted rates could go into force without further state activity. *Id.* (emphasis added). This discussion can be fairly read to support the proposition that the "active supervision" prong would be satisfied if the state or state agencies held ratemaking hearings on a consistent basis.

Certainly, the ICC's active supervision over the rates and activities of defendants stands in sharp contrast with that of the state agencies in *Ticor* but very much in line with the *Southern Motor Carriers* standard endorsed by the *Ticor* Court. Section 9-201 of the PUA expressly requires the filing of rates with the ICC and authorizes the ICC "to enter upon a hearing concerning the propriety of such [filed] rate or other charge, classification, contract, practice, rule or regulation, and pending the hearing and decision thereon, such rate or other charge, classification, contract, practice, rule or regulation shall not go into effect." Pursuant to this provision, the ICC held elaborate hearings after

14

the rates were filed by defendants. Upon conclusion of the hearings, the ICC issued lengthy orders approving the tariffs, which explicitly included the Customer Charge and the defendant utilities' provision of gas meters to customers. Throughout, the ICC has played an active role in setting the tariffs initially filed by defendants. We could reasonably conclude that hearings were held "on a consistent basis," and this active state involvement certainly goes far beyond the "potential" state supervision denounced in *Ticor*. *Id.* at 638-39. The lengthy hearings held by the ICC clearly satisfy the "active supervision" prong. Moreover, if ratemaking hearings held on a consistent basis could have satisfied the "active supervision" prong in *Southern Motor Carriers* even with the negative option rule in effect, certainly similar hearings held by the ICC in the instant case meets the test as no similar rule exists in Illinois with respect to gas utilities.

Finally, plaintiffs rely heavily on the Supreme Court case of *Cantor v. Detroit Edison Co.*, 428 U.S. 579 (1976). However, as defendants rightly point out, subsequent Supreme Court cases cast doubt on *Cantor*'s continued vitality. *Southern Motor Carriers* represents the Supreme Court's decisive move toward a broader view of the state action doctrine. 471 U.S. at 56-57. For example, the Supreme Court in *Southern Motor* specifically repudiated *Cantor's* suggestion that *Parker* state action immunity is limited to official action taken by state officials and does not protect a private utility. *Id.* Likewise, the *Southern Motor Carriers* Court rejected as "questionable dictum" *Cantor's* suggestion that state action immunity is dependent on a finding that an exemption from federal laws is "necessary." *Id.* at 57. Subsequently, other courts have followed the Supreme Court's lead in rejecting *Cantor*'s continuing viability. *See, e.g., Metro Mobile CTS, Inc. v. Newvector Communications, Inc.*, 661 F. Supp. 1504, 1513 (D. Ariz. 1987)

(declining to follow *Cantor* and applying state action doctrine to shield a cellular service provider from a federal antitrust challenge to its wholesale rates approved by state agency). *Cantor* is also factually distinguishable from the case at bar. While the electric company in *Cantor* provided a separate product, *i.e.*, light bulbs to its customers in addition to its utility service, here the meters are an integral part of the utility service provided by the defendants. Indeed, plaintiffs acknowledge as much in their Complaint. (Compl. ¶ 11.)

To conclude, the Court holds that the state action doctrine also independently bars plaintiffs' claims under the federal antitrust laws. The Court therefore grants defendants' motions to dismiss on this basis as well. Because the Court finds this action barred by the filed rate and state action doctrines, the Court need not address other arguments raised in support of defendants' motions.

## CONCLUSION

For the reasons set forth above, the Court grants defendants' Motions to Dismiss [doc. nos. 8-1, 70-1]. This case is hereby terminated.

**SO ORDERED**  ENTERED: 3/26/03

*/s/ Ronald A. Guzman*

**HON. RONALD A. GUZMAN**
**United States Judge**